# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN SANDERS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:14cv00238 TCM** |
| | ) | |
| CITY OF MARYLAND HEIGHTS, | ) | |
| MISSOURI, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

The matter is before the Court[1] on a motion for summary judgment [Doc. 75] filed by police officers John Portlock, Kevin Stewart, Chris Wegman, and Sam Starck[1] (as a group, the Court may refer to these Defendants as either "Defendant Officers" or "Movants"). Melvin Sanders ("Plaintiff") filed a brief in opposition to the summary judgment motion, and Movants filed a reply. The parties also filed statements of fact and exhibits in support of their positions on the motion.

## Background

Plaintiff's pending second amended complaint[2] contains three counts. Earlier, the Court dismissed Plaintiff's claims in Count I of the second amended complaint against the City of

---

[1] The matter is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2] This Defendant's last name is spelled "Stark" in the second amended complaint, but is spelled "Starck" in other materials filed of record, including material signed by this Defendant. The Court will spell this Defendant's last name as "Starck."

[2] Between paragraph 10 and paragraph 11 on page 3 of the second amended complaint is a paragraph numbered 20. There also is a paragraph 20 between paragraph 19 and paragraph 21 on page 5

Maryland Heights ("City") and in Count II of the second amended complaint against Defendant Officers sued in their official capacity. <u>See</u> Order, dated Apr. 7, 2015 [64]; Order, dated Feb. 23, 2015 [54]. The only count remaining before the Court is Count III, which is pursued under 42 U.S.C. § 1983. In that count, Plaintiff seeks monetary relief from Movants, who are sued in their individual capacities only.

This lawsuit arises out of an incident occurring outside Plaintiff's home at about 10:30 p.m. on April 9, 2012. In general, Plaintiff alleges that Defendant Officers violated his rights when they responded to a 911 call from Dennis R. Stephens ("Stephens"), who was outside Plaintiff's home and reported that Plaintiff had displayed a gun. More specifically, Plaintiff alleges that Defendant Officers violated Plaintiff's Fourth and Fourteenth Amendment rights

> by physically and verbally abusing him, subjecting him to a public and unreasonable search, placing him in handcuffs, pointing a [t]aser or other weapon at his head, threatening him and using excessive force when he was standing on the driveway of his home under circumstances when Defendant . . . Officers were reliably informed and/or it was apparent that [Plaintiff] did not have a gun or was not displaying a gun and Plaintiff was not otherwise armed or threatening violence and when Plaintiff was not otherwise engaged or likely to engage in any dangerous or illegal activity; and by selectiv[ely] using their authority against Plaintiff and in favor of . . . Stephens; all because of Plaintiff's race and/or without probable cause.

(Pl.'s Second Am. Compl. ¶ 36.) Based on those allegations, the Court understands that, in Count III of the second amended complaint, Plaintiff is pursuing the following § 1983 damages claims against Movants sued in their individual capacities: an excessive force claim, an unreasonable search claim, an unlawful seizure claim, and an equal protection claim. As a result of Defendant Officers' alleged conduct, Plaintiff states that he

---

of that complaint. The Court will refer to the first "paragraph 20" as "paragraph 10a" to the extent a reference to that paragraph is necessary.

has suffered assault; physical abuse; fear of police activity and possible criminal charges; embarrassment and humiliation due to the presence of police officers at his home with emergency lights; embarrassment and humiliation due to being accosted by armed police officers, handcuffed and searched in open view on the driveway of his own home; and mental and emotional distress.

(Id. ¶ 38.)   Plaintiff seeks nominal, actual, and exemplary or punitive damages, as well as reasonable attorney's fees and costs.  Defendant Officers deny liability.

By their summary judgment motion, Defendant Officers argue that there exists no genuine issue of material fact and they are entitled to judgment as a matter of law with respect to the §1983 claims in Count III either because the uncontroverted material facts do not establish that Movants violated Plaintiff's constitutional rights or because Movants are entitled to qualified immunity.   More specifically, Defendants contend Defendant Officers exercised appropriate force under the circumstances; they conducted an investigatory stop of Plaintiff, which was warranted under the circumstances; their warrantless search of Plaintiff was supported by exigent circumstances; and there is no evidence that Defendants engaged in racially discriminatory conduct during the incident.

Plaintiff opposes the motion on the grounds genuine issues of material fact exist as to each § 1983 claim against each Defendant in Count III of the second amended complaint so as to preclude the entry of summary judgment in any Defendant's favor.

The record discloses the following undisputed facts.   Plaintiff and his wife, Patricia Sanders, live in the City.   (Id. ¶ 2 [Doc. 58-1].)   During all relevant times, Defendant Officers were police officers with the City's Police Department and acted under color of law.   (Id. ¶¶ 5, 6; Defs.' Statem. Uncontr. Mat. Facts ¶¶ 1, 2 [Doc. 77].)   Plaintiff "and his wife are black or African American while Stephens and . . . Defendant Police Officers are white or Caucasian." (Second Am. Compl. ¶ 29.)

At about 10:30 p.m. on April 9, 2012, Stephens, who at the time worked for a company that repossessed personal property, went to Plaintiff's home in an attempt to locate a vehicle. (Defs.' Statem. Uncontr. Mat. Facts ¶¶ 3, 5.) Plaintiff learned that Stephens was on his property after dark when Plaintiff's wife told him that she had encountered Stephens, that Stephens had refused to leave, and that she was frightened. (Pl.'s Statem. Uncontr. Mat. Facts ¶¶ 13.1, 13.2 [Doc. 81].) Plaintiff ordered Stephens to get off his property. (Id. ¶ 13.4.) When Stephens refused, Plaintiff took a revolver from the glove box of his car and, when Stephens saw it, Stephens walked up the driveway away from Plaintiff and Plaintiff's home. (Id. ¶¶ 13.7, 13.8, 13.9.) Plaintiff then returned to the garage, put the revolver down, and went back to the driveway unarmed to wait for the police. (Id. ¶ 13.12.) Plaintiff had a valid concealed carry permit for the gun. (Id. ¶ 13.13.)

After seeing the gun, Stephens called 911 and spoke with a dispatcher for the City Police Department ("Dispatcher"). (Pl.'s Second Am. Compl. ¶¶ 20, 22.) In reporting the incident, Stephens told the Dispatcher in part that Plaintiff had been "obnoxious" during their exchange. (Pl.'s Statem. Uncontr. Mat. Facts ¶ 13.6.) No other 911 call was made to the Dispatcher during or regarding the April 9, 2012, incident at Plaintiff's home.

Several City police officers, including Defendant Officers, arrived at Plaintiff's home in response to the radio report of a "man with a gun" there. (Pl.'s Second Am. Compl. ¶¶ 26, 27; Defs.' Statem. Uncontr. Mat. Facts ¶¶ 3, 4.) Prior to their arrival at Plaintiff's home, the responding police officers knew that there was a dispute between a repossession agent and a homeowner at the homeowner's residence. (Pl's Statem. Uncontr. Mat. Facts ¶ 27.1.) The Dispatcher advised the responding police officers that the man with the gun was possibly "Marlon Sanders," a black male, wearing an orange t-shirt, and holding a small revolver. (Defs.'

Statem. Uncontr. Mat. Facts ¶ 6.) The Dispatcher also told the responding police officers that the man with the gun was "moving towards the garage" and Stephens, who the Dispatcher referred to as the victim, was "out in the street next to his truck." (Id. ¶ 7.) Then, the Dispatcher advised the responding police officers that the man had moved back out of the garage and had a black jacket on; and there might be "a female subject" inside the residence. (Id. ¶¶ 8, 9.)

Officer Stewart arrived first, identified the man standing in the driveway of the residence, drew his service revolver, ordered Plaintiff to show his hands, and loudly asked him if he had a gun. (Id. ¶ 14.) Plaintiff responded that he did, tried to explain that he had put it down, and raised his hands above his head. (Id. ¶¶ 15, 16.) Officers Wegman and Starck arrived and approached Plaintiff while Stewart was "covering" Plaintiff. (Id. ¶ 17.) Officers Wegman and Starck went behind Plaintiff to handcuff him; Officer Wegman placed a handcuff on Plaintiff's right wrist and, as Officer Wegman was preparing to cuff Plaintiff's left wrist, Plaintiff's left wrist moved away from Officer Wegman. (Id. ¶¶ 19, 20; Pl.'s Statem. Uncontr. Mat. Facts ¶ 13.20) Officer Starck told Plaintiff not to move and placed his taser on the back of Plaintiff's neck. (Defs.' Statem. Uncontr. Mat. Facts ¶¶ 21, 22.) Plaintiff complied with Officer Starck's order not to move, was placed in handcuffs, and Officer Starck removed the taser from Plaintiff's neck. (Id.¶ 23.)

When Sergeant Fink arrived, he first spoke with Stephens who said he was going to press charges against Plaintiff for flourishing a weapon. (Pl.'s Statem. Uncontr. Mat. Facts ¶¶ 20.3, 20.4.) Plaintiff called out to Sergeant Fink, who went to speak with Plaintiff. (Id. ¶ 20.6.) Sergeant Fink told Plaintiff he would not be arrested, but Sergeant Fink wanted to see the gun. (Id. ¶ 20.7.) Plaintiff reported where he had placed his revolver, and one of the police officers took it and removed the ammunition. (Defs.' Statem. Uncontr. Mat. Facts ¶ 31.)

At some point, Defendant Officers understood that Stephens was attempting to repossess a Pontiac Grand Prix, that the vehicle was not in Plaintiff's driveway, and that Stephens wanted to see if it was in Plaintiff's garage. (Pl.'s Statem. Uncontr. Mat. Facts ¶ 27.2.)

When responding to the "man with a gun" call for police service, the police officers did not use any racially offensive language to or about Plaintiff or Plaintiff's wife. (Defs.' Statem. Uncontr. Mat. Facts ¶ 26.)

Defendant Stewart: Officer Stewart averred that he was the first officer to arrive on the scene; he saw Plaintiff standing in his driveway; he drew his service revolver and "held it at the high ready position"; he approached Plaintiff and loudly asked Plaintiff if he had a gun; and, after Plaintiff responded that he did and Officer Stewart ordered Plaintiff to show his hands, Plaintiff raised his hands above his head. (Stewart Aff. ¶ 16 [Doc. 77-2].) Officer Stewart then "covered . . . Plaintiff with [his] weapon as Officers Starck and Wegman approached the Plaintiff, handcuffed him and searched him." (Id.) Officer Stewart reported that no gun was found "on Plaintiff's person." (Id.) Stewart further averred that he did not use physical force toward Plaintiff; did not use abusive language toward or about Plaintiff; did not use racially offensive language against or about Plaintiff or his wife; and did not "racially profile" Plaintiff. (Id. ¶¶ 17, 18, and 20.)

Officer Stewart also averred that he did not perform any investigation, including a search of any records, either to assist Stephens or to discredit Plaintiff. (Id. ¶ 19.)

Officer Starck: Officer Starck was one of the next two officers arriving at the scene after Officer Stewart. (Officer Starck Aff. ¶ 16 [Doc. 77-4].) Officer Starck averred that, upon his arrival, he

drew [his] service weapon and held it at the low ready position[;] . . . observed . . . Plaintiff was standing in his driveway and wearing a black jacket; . . . [then without pointing his] weapon at . . . Plaintiff[,] . . . holstered [his] weapon, drew [his] [taser], moved towards . . . Plaintiff and was prepared to assist Officer Wegman as [Officer Wegman] handcuffed . . . Plaintiff. After Officer Wegman placed a handcuff on Plaintiff's right wrist, [Officer Wegman] attempted to handcuff [Plaintiff's] left wrist[; and] Plaintiff then pulled his left wrist away from Officer Wegman and turned towards [Officer Starck, who] told . . . Plaintiff not to move and . . . placed the [taser] against . . . Plaintiff's neck area. Officer Wegman then took hold of . . . Plaintiff's left wrist and completed handcuffing him. [Officer Starck] then removed the [taser] from the back of Plaintiff's neck area.

(Id.)

Additionally, Officer Starck averred that he "did not conduct an investigation or search any records . . . or d[o] anything to assist [Stephens], or . . . to discredit . . . Plaintiff." (Id. ¶ 19.)

Officer Wegman: Officer Wegman averred that, he arrived at the scene at about the same time as Officer Starck. On his arrival, Officer Wegman

[u]nholstered [his] service weapon and held it at the high ready position. [He] approached and observed . . . Plaintiff was standing in his driveway and wearing a black jacket. [Officer Wegman then] holstered [his] weapon, moved behind . . . Plaintiff and told Plaintiff that [he] was going to handcuff [Plaintiff]. [Officer Wegman] placed a handcuff on Plaintiff's right wrist and attempted to handcuff [Plaintiff's] left wrist. As [Officer Wegman] did th[at], . . . Plaintiff pulled his left wrist away from [Officer Wegman] and towards Officer Star[c]k. [Officer Wegman] heard Officer Star[c]k tell . . . Plaintiff not to move. [Officer Wegman] then took hold of . . . Plaintiff's left wrist and completed handcuffing him. As [Officer Wegman] finished handcuffing . . . Plaintiff, [he] saw Officer Star[c]k remove a hand held [taser] from the back of Plaintiff's neck area. . . . Plaintiff was then searched because he was the person identified as being the "man with a gun.

Wegman Aff. ¶ 16 [Doc. 77-3].) Officer Wegman further averred that, in responding to this call, he "did not use any abusive language towards or about . . . Plaintiff; [he did not use] racially

offensive language to or about . . . Plaintiff or Mrs. Sanders; [and he] did not racially profile" Plaintiff. (<u>Id.</u> ¶¶ 17, 18, and 20.)

Additionally, Officer Wegman averred that he "did not conduct an investigation or search any records . . . or d[o] anything to assist [Stephens], or . . . to discredit . . . Plaintiff." (<u>Id.</u> ¶ 19.)

<u>Officer Portlock:</u>  Officer Portlock averred that by the time he arrived at the scene, Plaintiff was "being detained, handcuffed and searched by other officers." (Portlock Aff. ¶ 16 [Doc. 77-1].)  Officer Portlock further averred that, in responding to this call, he did not use any abusive language "towards or about . . . Plaintiff," did not use racially offensive language to or about Plaintiff or Mrs. Sanders, and did not racially profile Plaintiff. (<u>Id.</u> ¶¶ 17, 18, and 20.) Additionally, Officer Portlock averred that he "did not conduct an investigation or search any records . . . or d[o] anything to assist [Stephens], or . . . to discredit . . . Plaintiff." (<u>Id.</u> ¶ 19.)  In his deposition, Officer Portlock testified that it is resisting arrest for a person to pull away while an officer is trying to handcuff the person. (Portlock Dep. at 71 [Doc. 77-12].)

Officer Portlock testified in his deposition that he arrived, with another officer, Officer Fisher, after Officers Stewart, Wegman, and Starck arrived, and before Sergeant Fink arrived. (Portlock Dep. at 21 [Doc. 81-3].)  By the time Portlock arrived, he knew the location was Plaintiff's home and Plaintiff was being handcuffed. (<u>Id.</u> at 25-26 and 28.)  When he arrived, he first spoke with Plaintiff's wife, who was standing on the sidewalk in front of the home. (<u>Id.</u> at 31.)  She told Officer Portlock that she did not answer Stephens' questions. (<u>Id.</u>)  Next, Officer Portlock, along with Sergeant Fink, spoke with Stephens. (<u>Id.</u> at 36-39.)  Stephens told them he was still at the property because Plaintiff's wife had told him she was going to get her husband and Stephens could talk with him. (<u>Id.</u>)  Stephens also advised that he did not want to prosecute.

(Id. at 41.)  As they spoke to Stephens, Plaintiff called to Sergeant Fink.  (Id. at 39.)  When Sergeant Fink went to Plaintiff, Plaintiff asked that the handcuffs be removed and Sergeant Fink directed that they be removed.  (Id.)  Plaintiff insisted on showing them his gun and related materials, so  Officers Portlock and Fisher, and Sergeant Fink, followed Plaintiff into the garage, where Plaintiff showed them his gun, as well as his permit to carry a concealed weapon and a military identification card.  (Id. at 47-48.)  While Portlock was at the scene, Plaintiff did not try to hit anyone, did not throw anything, and did not threaten physical violence.  (Id. at 70.)

Plaintiff:  In his affidavit, Plaintiff averred that, at about 10:30 p.m. on April 9, 2012, his wife reported to him that there was a man on their property who had followed her to the garage and would not leave.  (Pl. Aff. ¶ 1 [Doc. 81-1].)  Plaintiff opened the garage door and saw the man, Stephens, and told him to get off the property.  (Id. ¶¶ 2 and 4-6.)  When Stephens did not leave, Plaintiff removed a revolver from the glove box of a car.  (Id. ¶¶ 6 and 8.)  After seeing the gun, Stephens walked up the driveway and placed a call to the police.  (Id. ¶¶ 7 and 8.)  Plaintiff heard Stephens talking to the police on the telephone, returned to the garage where he put down the revolver and put on a jacket, and returned, unarmed, to the driveway to wait for the police.  (Id. ¶¶ 11 and 12.)  Upon their arrival, the police "came at [Plaintiff] with guns drawn." (Id. ¶ 14.)  When the police officers ordered Plaintiff to raise his hands, he did so, and when the officers directed Plaintiff to put his hands behind his head, he did so.  (Id. ¶¶ 15 and 16.)  Plaintiff further averred that the police officers searched him when his hands were behind his head.  (Id. ¶ 17.)  After he was searched, Plaintiff states, the officers "put their hands on [him], brought him from a standing to a kneeling position and yelled at [him] to give them his hands, first [the right hand] and then the [left hand]."  (Id. ¶¶ 19 and 20.)

9

Plaintiff disagrees with Defendant Officers' position that Plaintiff resisted arrest while being handcuffed, but Plaintiff recalls

> that when I was on my knees and my right wrist was behind my back I looked over my right shoulder to see what was happening just as the police officer was reaching for my left wrist; my left wrist may have slipped from his grasp for an instant but he took it immediately down behind my back and handcuffed it to my right wrist.

(Id. ¶ 21.)  Plaintiff also avers that at some point, from the time he was on his knees, one of the police officers placed a taser against his head.  (Id. ¶ 22.)

When Plaintiff saw the Sergeant, Plaintiff called to him, the Sergeant went to Plaintiff and listened to him, then ordered the removal of the handcuffs, continued talking with Plaintiff, and asked Plaintiff to show him the gun.  (Id. ¶¶ 24 and 26.)

Plaintiff averred that he was very frightened by how the police officers treated him; that he had tried to explain to them that he was the homeowner, that Stephens had trespassed, and that Plaintiff had put the gun away, but the officers "would not pay any attention to" him; and he thought he was "treated very badly by [the police officers] . . . because [he] was black and . . . Stephens and the police officers were white."  (Id. ¶ 18; see also ¶¶ 25 and 26.)

In his deposition, Plaintiff testified that Stephens started moving away from the house when Stephens saw the revolver Plaintiff had.  (Melvin Sanders Dep. at 35 [Doc. 77-14 at 5].)  When the first police officer arrived, Plaintiff was wearing a black jacket and was standing in his driveway by the garage, while Stephens was standing on the street beside his truck.  (Id. at 45-46.)  That officer yelled at Plaintiff to get his hands in the air, and Plaintiff did that.  (Id. at 49-50.)  An officer yelled for Plaintiff to put his hands behind his head, which he did.  (Id. at 50.)  An officer patted Plaintiff down while his hands were in the air, told Plaintiff to get on his knees so the officer could handcuff Plaintiff, and directed Plaintiff to give the officer his arm.  (Id. at

50-51.)  Plaintiff testified that, as he was being handcuffed, he turned to see what the officer was doing behind him.  (Id.)  Additionally, Plaintiff acknowledged that no officer said anything racially offensive to Plaintiff during the incident.  (Id. at 68 [Doc. 77-14 at 11].)

Mrs. Sanders:  Plaintiff's wife testified at her deposition that no officer involved in the April 9, 2012, incident said anything she thought was either insulting or a personal comment about her or her husband.  (Patricia Sanders Dep. at 57-58 [Doc. 77-15].)  Moreover, she stated, none of the responding officers used any racially inappropriate statement or made any reference to race during the incident.  (Id.)

In Missouri, unlawful use of a weapon through the exhibition of a firearm can be a felony offense.  See Mo. Rev. Stat. § 571.030.1(4) ("A person commits the crime of unlawful use of [a] weapon[] if he or she knowingly . . . [e]xhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner"); Mo. Rev. Stat. § 571.030.8 ("[u]nlawful use of [a] weapon[] is a class D felony" in the absence of circumstances that do not apply here).

In support of his positions on the issues presented by the summary judgment motion, Plaintiff also provided the following materials: the depositions of Officer Portlock and  City Police Chief William Douglas Carson [Docs. 81-3 and 81-4]; a copy of the City's General Order 441.00, dated August 1, 2001, and titled "Officer Action in Property Interest Disputes," which includes provisions pertaining to "Automobile Repossessions," see General Order 441.03 [Doc. 81-5]; a copy of the City's General Order 410.00, dated August 7, 2009, and titled "Use of Lethal and Less-Lethal Weapons Use of Force Continuum," which encompasses the pointing of weapons and use of tasers, see General Order 441.00 [Doc. 81-6]; the City's General Order, 499.02 regarding training for use of a taser and 499.03 regarding use of a taser, dated October

26, 2009 [Doc. 81-7]; and a Disparity Index portion of a Missouri Stops report for the City [Docs. 81-8 and 81-9]. Defendants provided a copy of the recording and transcript of Stephens' call to the Dispatcher, various reports submitted by Defendant Officers about the incident, and, after Plaintiff filed a complaint about the incident, a copy of the report resolving the internal investigation of that complaint. See e.g., Defts.' Exs. E, E-1, G, I, K, K-1, M [Doc. 77].

### Discussion

Standard for Rule 56 Motion for Summary Judgment. A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (eff. Dec. 1, 2010); **MidAmerican Pension and Emp. Benefits Plans Admin. Comm. v. Cox**, 720 F.3d 715, 718 (8th Cir. 2013); see also **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (discussing prior Rule 56(c), the predecessor to Rule 56(a) of the Federal Rules of Civil Procedure). The existence of a factual dispute is not enough alone to avoid entry of summary judgment; "rather, the dispute must be outcome determinative under the applicable law." **Hammer v. City of Osage Beach, Mo.**, 318 F.3d 832, 837 (8th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." **Othman v. City of Country Club Hills**, 671 F.3d 672, 675 (8th Cir. 2012) (citing Anderson, 477 U.S. at 248).

In considering a motion for summary judgment, the Court must keep in mind that

[t]he movant "bears the initial responsibility of informing the . . . court of the basis for its motion," and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex[ Corp.,] 477 U.S. [at] 323 . . . . [The nonmovant then has the opportunity to

12

identify specific portions of the record showing there is a genuine dispute of material fact. See Fed. R. Civ. P. 56(c)(1).] . . . The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci, [557 U.S.] at [586], quoting Matsushita, 475 U.S. at 587.

**Torgerson v. City of Rochester**, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (second alteration in original). To establish a genuine dispute of material fact, the nonmovant "'may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [his] favor.' Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) (citation omitted)." **Fatemi v. White**, 775 F.3d 1022, 1040 (8th Cir. 2015). "Summary judgment [in favor of a defendant] is appropriate where [a plaintiff] has failed to present evidence sufficient to create a jury question as to an essential element of its claim." **St. Martin v. City of St. Paul**, 680 F.3d 1027, 1032 (8th Cir. 2012); accord **Rester v. Stephens Media, LLC**, 739 F.3d 1127, 1130 (8th Cir. 2014). Importantly, when resolving a summary judgment motion, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 . . . (2000), quoting Anderson . . ., 477 U.S. [at] 255 . . . ." **Torgerson**, 643 F.3d 1031 at 1042-43.

Claims under 42 U.S.C. § 1983; Qualified Immunity. Title 42 U.S.C. § 1983 "provides a cause of action to any person deprived of a federal right by someone acting under color of state law." **Ellis v. Houston**, 742 F.3d 307, 318 (8th Cir. 2014); accord **Alexander v. Hedback**, 718 F.3d 762, 765 (8th Cir. 2013) ("To state a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution [or] the laws of the United States and

that the deprivation was committed by a person acting under color of state law").  Because liability on a claim under § 1983 requires a violation of federal law, the Court will not address the arguments that Defendants violated City's policies or State law provisions.  Importantly, in a § 1983 action, "each defendant's conduct must be independently assessed" because damages liability for a federal constitutional tort under § 1983 is personal.  **Davis v. White**, 794 F.3d 1008, 1013 (8th Cir. 2015).

Here, there is no dispute that, during the relevant incident on April 9, 2012, each of the four Defendant Officers acted under color of state law.  The question is whether any of those Officers' conduct during that incident violated Plaintiff's federal constitutional rights.  See **Rogers v. City of Little Rock, Ark.**, 152 F.3d 790, 796 (8th Cir. 1998) ("The first step in a § 1983 analysis is 'to isolate the precise constitutional violation' which is alleged.  Baker v. McCollan, 443 U.S. 137, 140 (1979)").

That question is also important for qualified immunity purposes, because qualified immunity protects public officials, such as police officers, from a § 1983 lawsuit for damages, unless they have violated a federal statutory or constitutional right that was clearly established at the time of the challenged conduct.  **City and Cnty. of San Francisco, Calif. v. Sheehan**, 135 S. Ct. 1765, 1774 (2015).  More specifically, qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known."  **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982); accord **Tolan v. Cotton**, 134 S. Ct. 1861, 1866 (2014) (per curiam) (under qualified immunity, "[g]overnmental actors are 'shielded from liability for civil damages if their actions did not

violate "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

The question whether the right is clearly established is a question of law for the court. **Atkinson v. City of Mountain View, Mo.**, 709 F.3d 1201, 1211 (8th Cir. 2013). To find a right "clearly established," the court must determine that "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." **Id.** (internal quotation marks omitted) (quoting Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998; **El-Ghazzawy v. Berthiaume**, 636 F.3d 452, 459 (8th Cir. 2011) (to ascertain whether a right is "clearly established," the court asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (internal quotation marks omitted) (quoting Frye v. Kansas City Mo. Police Dep't, 375 F.3d 785, 789 (8th Cir. 2004)). This requires the court to "examine whether prior case law provided 'fair warning' the officer's conduct was unconstitutional. Hope . . . ., 536 U.S. [at] 740-41 . . . ." **El-Ghazzawy**, 636 F.3d at 459. A case directly on point is not required before deciding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." **Stanton v. Sims**, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011)).

To resolve qualified immunity issues at the summary judgment stage, the Court engages in a two-pronged inquiry. One prong determines whether the facts taken in the light most favorable to the injured party show the government official's conduct violated a federal statutory or constitutional right. **Tolan**, 134 S. Ct. at 1865. The second prong ascertains whether that right was clearly established at the time of the violation. **Id.** at 1866 (citing Hope, 536 U.S. at 739). The Court may address those two prongs in any order. **Pearson v. Callahan**, 555 U.S.

223, 236 (2009).  To withstand a summary judgment motion based on qualified immunity, the plaintiff must assert a violation of his federal constitutional right, demonstrate that right was clearly established at the time of the incident, and show a genuine dispute of material fact exists as to whether the official would have known his alleged conduct violated that clearly established federal constitutional right.  **Brockinton v. City of Sherwood, Ark.**, 503 F.3d 667, 672 (8th Cir. 2007).  If no constitutional violation is established, then the Court does not continue the qualified immunity analysis.  **Id.**

For his excessive force claim, Plaintiff alleges that Defendant Officers physically and verbally abused him, pointed a taser or other weapon at his head, and

> threaten[ed] him and us[ed] excessive force when he was standing on the driveway of his home under circumstances when Defendant Police Officers were reliably informed and/or it was apparent that Plaintiff did not have a gun or was not displaying a gun and Plaintiff was not otherwise armed or threatening violence and when Plaintiff was not otherwise engaged in any dangerous or illegal activity.

For his unreasonable search and seizure claims, Plaintiff alleges that Defendant Officers subjected him to a public and unreasonable search, and unreasonably seized him by handcuffing him.  Finally, Plaintiff claims the four Defendant Officers violated his right to equal protection in that Defendants, who are white, selectively used their authority against Plaintiff, who is black, and in favor of Stephens, who is white, either because of Plaintiff's race or without probable cause.

<u>Fourth Amendment Claims (Excessive Force, Unreasonable Seizure, and Unreasonable Search)</u>.  The Fourth Amendment protects individuals from unreasonable searches and seizures by government officials.  U. S.  Const. amend. IV.

A seizure of a person for purposes of the Fourth Amendment occurs when there is "a governmental termination of freedom of movement through means intentionally applied." **Brower v. County of Inyo**, 489 U.S. 593, 597 (1989). Put another way, "[a] seizure of [a] person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.""" **Kaupp v. Texas**, 538 U.S. 626 (2003) (per curiam) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). "The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." **Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.,** 542 U.S. 177, 187-88 (2004) (internal quotation marks omitted) (quoting Delaware v. Prouse, 440 U.S. 648, 654 (1979)).

It is clear from the undisputed facts that, when Officers Stewart, Wegman, and Starck arrived at Plaintiff's home on April 9, 2012, those officers' conduct of pointing a gun at Plaintiff (Officer Stewart) and displaying guns while approaching Plaintiff (Officers Wegman and Starck) constituted a seizure of Plaintiff. Additionally, Officer Starck's placement of a taser against Plaintiff's neck and Officer Wegman's handcuffing of Plaintiff constituted the seizure of Plaintiff. That intentional conduct by Defendant Officers would clearly convey to a reasonable person that the person was not at liberty to ignore the officers and that the person's freedom of movement was stopped. While Officer Portlock's subsequent arrival did not involve the display or other use of his weapon, his arrival did not immediately result in Plaintiff's freedom of movement. To the extent his arrival resulted in the continued intentional detention of Plaintiff by the responding

officers, Officer Portlock's conduct at the scene may be considered as a continued seizure of Plaintiff.

"Under Terry v. Ohio, 392 U.S. 1 (1968), 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop [of a person] when the officer has a reasonable articulable suspicion that criminal activity is afoot.'  Illinois v. Wardlow, 528 U.S. 119, 123 (2000)."  **El-Ghazzawy**, 636 F.3d at 456.  A Terry stop may occur even though the relevant felony offense is complete.  **United States v. Sokolow**, 490 U.S. 1, 7-8 (1989); **United States v. Hensley**, 469 U.S. 221, 227-29 (1985).

The officers' reasonable suspicion must be based upon particularized, objective facts and rational inferences from those facts.  **United States v. Smith**, 648 F.3d 654, 658 (8th Cir. 2011) (internal quotation marks omitted) (quoting United States v. Lopez-Mendoza, 601 F.3d 861, 865 (8th Cir. 2010)); see also **Hensley**, 469 U.S. at 229 (for completed felonies, a Terry stop may occur "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony").  The court considers the totality of the circumstances to ascertain whether the officer has a particularized, objective basis for the stop.  **United States v. Robinson**, 670 F.3d 874, 876 (8th Cir. 2012).

Here, it was reasonable for Defendant Officers to detain Plaintiff upon arrival at his home on April 9, 2012.  The undisputed materials available of record disclose that, by the time of their arrival at the scene, Defendant Officers had a reasonable suspicion that Plaintiff had earlier flourished a gun in the presence of Stephens, the person who had called the Dispatcher and was still at the scene.  Those Officers also had particularized information from the Dispatcher that the "man with a gun" was a black male wearing a black jacket who was located near the house, while

the person reporting the incident to the Dispatcher, who the Dispatcher referred to as the victim, was located on the street next to his truck. Based on the Dispatcher's reported description of the "man with the gun," Officers Stewart, Wegman, and Starck had a reasonable suspicion based on particularized facts provided by Stephens and the Dispatcher to support the prompt seizure of Plaintiff when he was found near his house wearing a black jacket. Additionally, based on the reported information it was reasonable for Officer Portlock to maintain the seizure of Plaintiff until he and Sergeant Fink completed their investigation by talking to Plaintiff's wife and Stephens at the scene. Defendant Officers did not violate the Fourth Amendment when they stopped and investigated Plaintiff due to the information they had. See **Adams v. Williams**, 407 U.S. 143, 147 (1972) (reasonable suspicion for a <u>Terry</u> stop need not be based solely on the officer's own observations but may also be based on information provided by another person); **Benigni v. Smith**, 121 Fed. Appx. 164, 165 (8th Cir. 2005) (unpublished per curiam opinion) ("[o]fficers are entitled to rely on the veracity of information supplied by the victim of a crime"); **United States of America v. Rose**, 19 Fed. Appx. 481 (8th Cir. 2001) (unpublished per curiam opinion) (concluding that police officers "had reasonable suspicion for the initial stop and reasonable cause to believe [the defendant] was armed and could pose a danger to them" so as to justify the stop and frisk of the defendant when the officers responded "to a report of a disturbance involving an individual who they believed was armed – based on information they had received from the complainant and the police dispatcher – and who matched [the defendant]'s description").

Plaintiff urges that the April 9, 2012, incident did not involve an investigatory stop because no crime was occurring when the police arrived. As noted earlier, however, an investigatory stop may occur due to reliable, trustworthy information provided by someone other

than the police officer, such as Stephens, and may occur based on information regarding a completed felony, such as the report that Plaintiff flourished his revolver in Stephens' presence. **Hensley**, 469 U.S. at 229; <u>see</u>, <u>also</u>, **Rose**, supra.

Plaintiff also contends that the detention of Plaintiff did not constitute an investigatory stop because he was merely standing in the driveway of his home and the Dispatcher had relayed the information that the gun was not visible. When considering how to approach a reported situation, however, a responding police officer may take into consideration all known information, not just the appearance of the situation upon the officer's arrival. Here, the information reported to Defendant Officers by the Dispatcher supports the conclusion that the possible presence of a firearm in Plaintiff's control required a reasonable effort to protect the safety of the officers and others, necessitating a stop and investigation of Plaintiff.

To the extent Plaintiff contends the responding officers knew prior to their arrival that the gun was no longer visible, that position is not supported by the undisputed recording and transcript of the Dispatcher's statements to the responding officers, which do not contain a report from the Dispatcher that the gun was no longer visible. Nevertheless, even if Defendant Officers were advised, prior to their arrival, that the gun was no longer visible, their approach to and detention of Plaintiff was reasonable in that they had no knowledge where the gun was and how accessible it was to Plaintiff.

Because the detention of Plaintiff was an investigatory stop, and there is no evidence that Plaintiff was arrested as a result of the incident, the Court will not address the parties' probable cause arguments.

While it was reasonable for Defendant Officers to engage in an investigative stop under the circumstances, such a stop may violate the Fourth Amendment, "if it is excessively intrusive

in its scope or manner of execution." **El-Ghazzawy**, 636 F.3d at 457 (internal quotation marks omitted) (quoting United States v. Johnson, 592 F.3d 442, 451 (3rd Cir. 2010)).  "Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," **Graham v. Connor**, 490 U.S. 386, 396 (1989); however, the right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of a person, see **id.** at 388; **Copeland v. Locke**, 613 F.3d 875, 881 (8th Cir. 2010).  "The force employed by an officer is not excessive and thus not violative of the Fourth Amendment if it was 'objectively reasonable under the particular circumstances.'"  **Greiner v. City of Champlin**, 27 F.3d 1346, 1354 (8th Cir. 1994).  To determine whether the force used was objectively reasonable, as opposed to excessive, the court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." **Graham**, 490 U.S. at 396.

Importantly, the court must not allow "the 20/20 vision of hindsight" to cloud "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  **Id.** at 396-97.  Therefore, the reasonableness of an officer's use of force in seizing a person is not judged in hindsight but "'from the perspective of a reasonable officer on the scene . . . .' [Id. at] 396."  **Hollingsworth v. City of St. Ann**, 800 F.3d 985, 989 (8th Cir. 2015).

Not every push or shove, or similar conduct, even if subsequently viewed as unnecessary, will violate the Fourth Amendment.  **Cook v. City of Bella Villa**, 582 F.3d 840, 849 (8th Cir. 2009).  The use of de minimis force is insufficient to establish a Fourth Amendment claim.

**Chambers v. Pennycook**, 641 F.3d 898, 906 (8th Cir. 2011). While injury and force are "only imperfectly correlated," the extent of the injury may provide some indication of the amount of force applied. **Wilkins v. Gaddy**, 559 U.S. 34, 38 (2010) (per curiam) (noting that a prisoner's Eighth Amendment challenge to a "push or shove" causing no discernible injury "almost certainly fails to assert" an excessive force claim). Therefore, while not dispositive, the degree of injury suffered as a result of the officers' conduct is relevant to show the amount and type of force used. **Chambers**, 641 F.3d at 906; accord **LaCross v. City of Duluth**, 713 F.3d 1155, 1158-59 (8th Cir. 2013) (applying Chambers to an officer's use of a taser).

When police officers engage in an investigative stop of a person reported to be armed, they are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." **Hensley**, 469 U.S. at 235 (discussing a Terry stop of an individual reported in another police department's flyer as being "armed and dangerous"). Such steps may include brandishing weapons. **United States v. Smith**, 648 F.3d 654, 659 (8th Cir. 2011) (when officers carrying out a Terry stop or "investigative detention" are presented with serious danger, "they may brandish weapons . . . in order to control the scene and protect their safety") (internal quotation marks omitted) (quoting United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004)). In a situation similar to the incident at issue here, the United States Court of Appeals for the Eighth Circuit found that officers acted reasonably by brandishing their weapons when responding to a report that individuals threatened another while carrying firearms. **United States v. Lloyd**, 36 F.3d 761, 763 (8th Cir. 1994) (concluding that the officers' conduct did not transform the otherwise valid Terry stop into an arrest).

Plaintiff urges there is no evidence that Plaintiff committed a dangerous and serious felony that presented a danger to the responding officers and others. The Court disagrees. Defendant Officers were responding to the report of a "man with a gun," which an objective police officer may reasonably and objectively interpret as presenting potential danger to a responding officer and others at the scene. Additionally, an objective officer responding to such a report may reasonably consider the situation as possibly constituting the felony of unlawful use of a weapon.

Plaintiff counters that he was properly dealing with a trespasser at his home when he showed his gun to Stephens and, therefore, Defendant Officers' response at the scene was not reasonable. It is undisputed that the police department did not receive a call from Plaintiff or his wife reporting an alleged trespass or other improper conduct by Stephens. While the undisputed record indicates that, prior to their arrival at Plaintiff's home, Defendant Officers may have known there was a dispute between a repossession agent and a homeowner at the homeowner's residence, there is no indication that those officers knew the repossession agent may have been trespassing or otherwise violating the law. Furthermore, a trespass does not lessen the potential danger to anyone at the scene presented by Plaintiff's reported possession and display of a gun.

Furthermore, to the extent, if any, that Defendant Officers knew about the trespassing circumstances prior to their arrival at the scene, that knowledge would not make unreasonable the response of Officers Stewart, Wegman, and Starck upon their arrival at the scene. Their initial attention and effort were properly focused on the possibility that the man in the black jacket who was near the house had access to a gun, which could present a danger to the officers and others at the scene.

To the extent Plaintiff contends the responding officers knew that the gun was no longer visible, that position is not supported by the undisputed recording and transcript of the Dispatcher's statements to the responding officers, which do not contain a report from the Dispatcher that the gun was no longer visible. Nevertheless, even if Defendant Officers were advised, prior to their arrival, that the gun was no longer visible, their approach to Plaintiff was reasonable in that they had no knowledge where the gun was and how accessible it was to Plaintiff.

Under the circumstances, Defendant Officers did not use excessive force when detaining Plaintiff by brandishing or displaying their guns.

Handcuffing. Plaintiff specifically challenges his seizure based on the fact he was handcuffed. The undisputed record discloses that Defendant Officer Wegman placed the handcuffs on Plaintiff, while Officer Stewart had a gun pointing at Plaintiff and while Officer Starck, at some point during the handcuffing, placed a taser against Plaintiff's neck. Officer Portlock was not directly involved in the handcuffing of Plaintiff.

When stopping or investigating a person who may be armed and dangerous, the participating police officers are authorized to handcuff the person. **Smith**, 648 F.3d at 659 (when officers carrying out a Terry stop or "investigative detention" are presented with serious danger, "they may . . . constrain the suspect with handcuffs"); see also **United States v. Robinson**, 670 F.3d 874, 877 (8th Cir. 2012) ("The police . . . did not exceed the permissible bounds of an investigative stop in handcuffing [the detained person] and placing him in the patrol car" when, in relevant part, the officers "had specific information that [he] possessed a firearm just minutes earlier"); **United States v. Miller**, 974 F.2d 953, 957 (8th Cir. 1992) ("a police officer's use of handcuffs can be a reasonable precaution during a Terry stop").

Due to the information conveyed by the Dispatcher to Defendant Officers that Plaintiff had displayed a gun in Stephens' presence while at Plaintiff's home, and that Plaintiff and Stephens were still at Plaintiff's residence, an objective officer arriving at Plaintiff's home could reasonably respond to the situation by handcuffing Plaintiff. See, e.g., **United States v. Martinez**, 462 F.3d 903, 907 (8th Cir. 2006) (officers responding to the report of a robbery involving the brandishing of a gun and finding a person acting suspiciously near the scene of the offense with "a wad of cash" acted reasonably by handcuffing the person to protect their safety and maintain the status quo because "he might still have the gun used to commit the crime").

With respect to Officer Wegman, the undisputed record shows that he physically placed the handcuffs on Plaintiff and does not indicate that he, in any manner, improperly or unreasonably handcuffed Plaintiff. In and of itself, Officer Wegman's act of handcuffing Plaintiff was reasonable under the circumstances.

Even if Officer Wegman's use of handcuffs and Officer Starck's use of a taser during the handcuffing was not reasonable, the use of that show of force was not excessive under the circumstances. In particular, during this incident, Defendant Starck did not discharge the taser and Defendant Stewart did not discharge his gun. Additionally, there is no indication that Officer Wegman's handcuffing was improperly performed or resulted in injury to Plaintiff. Plaintiff did not allege or provide evidence that he suffered any physical injury as a result of any conduct by any of the Defendant Officers. Moreover, no medical records or other evidentiary material is available of record to substantiate Plaintiff's alleged embarrassment, humiliation, fear, and mental and emotional distress resulting from the incident. Therefore, the Court concludes any force used by Defendant Officers during the April 9, 2012 incident was de minimis. Such force does not constitute excessive force.

To the extent Officer Starck's placement of a taser on Plaintiff's neck during the handcuffing should be deemed excessive, Officer Starck is entitled to qualified immunity for that conduct. Prior to this incident, case law revealed that police officers could properly discharge tasers during attempts to subdue an individual not complying with a police officer's effort to detain the person. See, e.g., **United States v. Blackmon**, 662 F.3d 981, 984 (8th Cir. 2011) (a police officer responding to a dispatch unsuccessfully attempted to subdue an individual by discharging a taser three times); **United States v. Oliver**, 550 F.3d 734, 736 (8th Cir. 2008) (discharge of a taser to subdue a non-compliant person after a traffic stop). Nothing in the law prior to April 9, 2012 clearly established that an individual's Fourth Amendment rights were violated by an officer's display of a taser without discharge of the taser during the officer's effort to obtain compliance with the detention of the person. See **Noe v. West Virginia**, 2010 WL 3025561, *7 (N.D. W.Va. July 29, 2010) (noting that "merely pointing a taser cannot support a claim of excessive force" and citing Michenfelder v. Sumner, 860 F.2d 328, 333-34 (9th Cir. 1988)) **Policky v. City of Seward, Neb.**, 433 F.Supp.2d 1013, 1025 (D. Neb. 2006) (noting that "[i]f the act of drawing and pointing a gun loaded with bullets does not violate the Fourth Amendment, then the act of drawing and pointing a gun charged with electricity can hardly give rise to a claim of excessive force").

Plaintiff further urges that Defendants' use of force was not reasonable because he did not resist detention by his behavior during handcuffing. The undisputed record, however, discloses that Plaintiff's left wrist or arm moved while Plaintiff was being handcuffed. Such movement may properly be construed by reasonable police officers as Plaintiff being noncompliant and resisting efforts to handcuff him, despite Plaintiff's intention in making the move. See, e.g., **Carpenter v. Gage**, 686 F.3d 644, 650 (8th Cir. 2012) ("[e]ven if [the individual]'s motive was

innocent, the deputies on the scene reasonably could have interpreted [the individual]'s actions [in refusing to offer hands for handcuffing] as resistance and responded with an amount of force that was reasonable to effect the" detention); **Crumley v. City of St. Paul, Minn.**, 324 F.3d 1003, 1007-08 (8th Cir. 2003) (individual's movement away from the officer's push "may have been entirely natural, [but] it nonetheless constituted resistance [and r]esistance may justify the use of greater force"); see also City Police Chief William Douglas Carson Dep. at 81 [Doc. 81-4].

Under the circumstances, neither the brandishing of weapons nor the handcuffing rendered the Terry stop of Plaintiff on April 9, 2012, unreasonable. See **United States v. Ramires**, 307 F.3d 713, 716-17 (8th Cir. 2002). In that case, the United States Court of Appeals for the Eighth Circuit affirmed a district court's conclusion that the circumstances justified a Terry stop and that stop was sufficiently limited in scope and duration. **Id.** The case involved challenges to the conduct of police officers responding to a 9:00 p.m. dispatch based on complaints of an odor of drugs at an apartment complex. **Id.** at 714. While outside the apartment, a police officer drew his weapon and told three individuals he discovered in a crawlspace to freeze. **Id.** When backup arrived, the individuals were instructed to exit, were placed on the ground, had their hands cuffed behind their backs, and then stayed on the ground for approximately three minutes. **Id.** at 714-15. When the apartment door was opened by an individual inside, an officer drew his weapon and had the individuals inside put their hands on their heads; and then they were handcuffed. **Id.** at 715. The Eighth Circuit concluded that the Terry stop of those in the crawlspace was justified because it was late at night, the suspects emerged from a crawlspace in a dimly lit area, and the police "were investigating drug activity, which frequently involves weapons." **Id.** at 716. Additionally, the appellate court found the

Terry stop was sufficiently limited in scope and duration, and the "permissible scope of the detention was not exceeded when [the] police ordered [the individuals] out of the crawlspace at gunpoint and handcuffed them" or when the police officers kept them detained for the brief time it took to secure the apartment. **Id.**

As in **Ramires**, Defendant Officers were responding at night to a report of a man with a gun. The Officers' use of drawn or displayed weapons and handcuffs to stop and detain Plaintiff as they kept themselves and others safe at the scene and investigated the location of the gun and circumstances of the report was justified and did not constitute excessive force.

Search. Plaintiff further argues that Defendant Officers' warrantless search of Plaintiff was unreasonable. A warrantless search of the person subjected to an investigatory stop may occur solely for the purpose of the protection of the police officer and others nearby. **Terry**, 392 U.S. at 29. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon." **Minnesota v. Dickerson**, 508 U.S. 366, 373 (1993) (citing Terry, 392 U.S. at 24). The officers "need not know for certain that the suspect is armed; instead, a search is permitted 'if a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."'" **United States v. Trogdon**, 789 F.3d 907, 910 (8th Cir.) (quoting United States v. Horton, 611 F.3d 936, 941 (8th Cir. 2010)), cert. denied, 136 S. Ct. 376 (2015). The scope of such a search is limited to the discovery of concealed weapons, which allows a pat-down search. See **United States v. Muhammad**, 604 F.3d 1022, 1026 (8th Cir. 2010); accord **United States v. Cornelius**, 391 F.3d 965, 967-68 (8th Cir. 2004) (the officer

stopping a person who may be armed and dangerous may frisk or pat-down the person for weapons).

Here, the undisputed record reveals that the only Defendant Officer involved in searching Plaintiff was Officer Wegman. The only circumstance Plaintiff disputes is the timing of the search, not the manner or scope of the search. Plaintiff states the search occurred before he was handcuffed, whereas Officer Wegman reports it occurred after Plaintiff was handcuffed. Viewing the evidence in favor of Plaintiff, the Court finds the search occurred before Plaintiff was handcuffed.

As to the timing of the search, conducting a patdown search either after handcuffing or before handcuffing a person subject to a Terry stop is reasonable. See **Muhammad**, 604 F.3d at 1027 (a pat-down search after handcuffing "was reasonably designed to discover concealed weapons"); **United States v. Gilliam**, 520 F.3d 844, 847-48 (8th Cir. 2008) (before handcuffing the person, the police officers engaged in a reasonable Terry pat-down search of the person). Therefore, the dispute about when the search occurred is not material to determining the reasonableness of the search.

Regardless of the timing of the search, there is no indication that the manner or scope of the search exceeded a pat-down search, the type of search allowed to ascertain during a Terry stop whether or not a person has weapons. Therefore, the scope and manner of the search were reasonable.

Based on the available record, Defendant Officers did not violate Plaintiff's Fourth Amendment right to be free from unreasonable searches, either because the officers did not participate in the warrantless search of Plaintiff (Officers Stewart, Starck, and Portlock) or because the search was proper in timing, manner, and scope (Officer Wegman).

Equal Protection.  For Plaintiff's equal protection claim he asserts that, during the April 9, 2012 incident, the responding police officers focused on him, rather than Stephens, due to Plaintiff's race.  This argument is based on the fact that the officers and Stephens were white and Plaintiff is black.

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race [and] the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."  **Wren v. United States**, 517 U.S. 806, 813 (1996).  For this claim, Plaintiff "must prove that [the responding officers] exercised [their] discretion . . . on account of [his] race, which requires proof of both discriminatory effect and discriminatory purpose."  **Johnson v. Crooks**, 326 F.3d 995, 999-1000 (8th Cir. 2003).  When a claim against police officers is for a racially-motivated stop, "the plaintiff must normally prove that similarly situated individuals were not stopped or [detained] in order to show the requisite discriminatory effect and purpose."  **Id.** at 1000.  Alternatively, Plaintiff may present direct evidence of racial discrimination to support this type of claim.

Here, however, Plaintiff has not offered any evidence that any of Defendant Officers failed to stop or detain non-African-Americans under similar circumstances.  Additionally, the undisputed record contains no direct evidence of racial discrimination by the responding officers.  Nor does the record reveal any genuine dispute of material fact regarding Plaintiff's equal protection claim, whether based on direct or indirect evidence of racial discrimination.

Based on the report received from Stephens, the Dispatcher described the man displaying the gun as a black male who was located by the house and the person reporting the situation to the Dispatcher as located near his truck on the street.  When the responding officers arrived at the

house, only one of the two men outside the house was black, and only that man was located by the house. Based on the information they had received from the Dispatcher and the circumstances at the scene, Defendant Officers reasonably directed their efforts toward the black man by the house, rather than toward the white man by the truck on the street, when they arrived at Plaintiff's house on April 9, 2012. None of Defendant Officers conducted themselves, by words or actions, in a racially discriminatory fashion when responding to the reported situation at Plaintiff's house on April 9, 2012, or while investigating that situation at the scene. Plaintiff's constitutional right to equal protection was not violated by Defendant Officers' conduct at Plaintiff's house on April 9, 2012.

To the extent Plaintiff relies on the Stops Report to support his position on his equal protection claim, that Report is not relevant. That report focuses on police officers' stops of motor vehicles; and Plaintiff here was not stopped by police officers while driving a motor vehicle.

## Conclusion

No genuine disputes of material facts or questions of law exist to prevent entry of summary judgment in favor of Defendant Officers. The undisputed record and applicable law support the conclusion that Defendant Officers did not violate Plaintiff's constitutional rights to be free from unreasonable searches and seizures and to equal protection. To the extent Officer Starck's conduct in placing a taser on Plaintiff's neck while he was being handcuffed may be deemed unconstitutional, Officer Starck is entitled to qualified immunity for that conduct because it was not clearly established as of April 9, 2012, that such conduct violated the Fourth Amendment. Therefore, Defendants' summary judgment motion will be granted in all respects.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment [Doc. 75]

is **GRANTED**.

An appropriate Judgment will accompany this Memorandum and Order.


/s/Thomas C. Mummert, III
**THOMAS C. MUMMERT, III**
**UNITED STATES MAGISTRATE JUDGE**


Dated this 2nd day of December, 2015.